1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

8
9
10
11
12
13
14
15
16

DOUGLAS J. DiBIASI,                    )        No. CV-07-276-LRS
                                       )
                                       )
                                       )        **ORDER RE**
                        Plaintiff,     )        **MOTIONS FOR**
                                       )        **SUMMARY JUDGMENT**
v.                                     )
                                       )
STARBUCKS CORPORATION, et              )
al.,                                   )
                                       )
                                       )
                        Defendants.    )
                                       )

17
18
19
20

  **BEFORE THE COURT** is the Spokane County Defendants' Motion For
Summary Judgment (Ct. Rec. 72), Defendants Starbucks' and Leslie Ruff's
Motion For Summary Judgment (Ct. Rec. 77), and Defendant Heidi Parr's Motion
For Summary Judgment (Ct. Rec. 83)**.**

21
22
23
24

  Oral argument was heard on May 7, 2009.  Richard D. Wall, Esq., argued
for the Plaintiff.  Heather Yakely, Esq., argued for the Spokane County
Defendants.  Mary P. Gaston, Esq., and Hugh E. Handeyside, Esq., argued for
Defendants Starbucks, Leslie Ruff, and Heidi Parr.

25
26

## I.  BACKGROUND

27
28

  On January 27, 2007, Plaintiff was arrested by Spokane County Sheriff's
deputies and charged with three counts of indecent exposure based on an

**ORDER RE MOTIONS
FOR SUMMARY JUDGMENT-**  **1**

allegation that three employees of a Starbucks store in Airway Heights, Washington had witnessed him masturbating as he sat in his vehicle in the drive-through lane of the store.  The criminal charges were eventually dismissed by the Spokane County Prosecutor's office.

Plaintiff's Amended Complaint alleges federal civil rights claims pursuant to 42 U.S.C. Section 1983, state law tort claims, and a claim pursuant to the Washington Law Against Discrimination (WLAD), RCW 49.60 et seq.


## II.  DISCUSSION

### A.  Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court.  *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469 (1975).  Under Fed. R. Civ. P. 56, a party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986); *Semegen v. Weidner*, 780 F.2d 727, 732 (9th Cir. 1985).  Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law.  *Anderson*, 477 U.S. at 248.

The moving party has the initial burden to prove that no genuine issue of material fact exists.  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986).  Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*  The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986).

In ruling on a motion for summary judgment, all inferences drawn from the

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    2**

underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587.  Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim.  *Celotex*, 477 U.S. at 322-23.

**B.  42 U.S.C. Section 1983 Claims**

**1.  Fourth Amendment False Arrest/False Imprisonment Claim (Defendant Thomas Edelbrock)**

Plaintiff alleges the criminal charges against him were fabricated and the result of a civil conspiracy between Spokane County Sheriff's Deputy Thomas Edelbrock and Leslie Ruff, the manager of the Starbucks store in question. Plaintiff alternatively asserts that even in the absence of a conspiracy, Edelbrock is liable under 42 U.S.C. Section 1983 for falsely arresting and imprisoning the Plaintiff in violation of his federal constitutional rights.

The Fourth Amendment requires law enforcement officers to have probable cause before making a warrantless arrest.  *Michigan v. Summers*, 452 U.S. 692, 700, 101 S.Ct. 2587 (1981).  "Probable cause to arrest exists when officers have knowledge of reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested."  *United States v. Lopez*, 482 U.S. 1067, 1072 (9th Cir. 2009).  An arrest is unlawful unless there is probable cause to believe that a specific criminal statute has been or is being violated.  *Devenpeck v. Alford*, 543 U.S. 146, 152, 124 S.Ct. 588 (2004).  Because probable cause is a wholly objective, "reasonable officer" standard, the officer's subjective motivation is irrelevant.  *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769 (1996).

Deputy Edelbrock contends he had probable cause to arrest the Plaintiff because at the time of the arrest: 1) he had the information relayed to him from

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    3**

1  dispatch that a man was masturbating in his vehicle at the Airway Heights
2  Starbucks store; 2) there were three witnesses to this (Ruff, Elisa Danen and
3  Pamela Siegel); 3) he understood there was a video of the incident; 4) he observed
4  that Plaintiff had a "continuing erection" when he arrested the Plaintiff; and 5)
5  Plaintiff on more than one occasion stated that he had not done anything wrong.

6      RCW 9A.88.010(1) states that "[a] person is guilty of indecent exposure if
7  he or she intentionally makes any open and obscene exposure of his or her person
8  or the person of another knowing that such conduct is likely to cause reasonable
9  affront or alarm."  Plaintiff contends Deputy Edelbrock did not have probable
10  cause to believe that Plaintiff ever exposed his "person," that being his penis, to
11  anyone at the Starbucks store.  Plaintiff contends there is at least a material issue
12  of fact with regard to this issue.

13      At her deposition, Ruff testified she could not remember if she told
14  Edelbrock whether she saw Plaintiff's "naked erect penis." (Ruff Dep. at p. 56,
15  Ex. D to Ct. Rec. 73).  Ruff testified that Plaintiff "raised his hips off the seat,
16  exposed his penis, had his hand around it and was masturbating." (*Id*. at p. 41).
17  Yet, Ruff cannot recall if and whether this is what she told Deputy Edelbrock
18  because she "does not remember the details of our conversation." (*Id*. at p. 56).
19  In her post-deposition declaration submitted in support of her motion for summary
20  judgment, however, Ruff states unequivocally that "I told Deputy Edelbrock that I
21  had seen a customer **expose himself and masturbate** in the drive through via the
22  monitor." (Ct. Rec. 80 at p. 5). (Emphasis added).  This statement appears to be
23  at odds with Ruff's deposition testimony.  In an interview with defense
24  investigator Ted Pulver conducted approximately two weeks after January 27,
25  2007, Ruff said she saw Plaintiff's penis and that he was masturbating. (Ruff
26  Interview at p. 5, Handeyside Declaration, Ct. Rec. 82 at p. 0006), but also
27  acknowledged that in the three or four times after the incident that she happened to
28

**ORDER RE MOTIONS
FOR SUMMARY JUDGMENT-    4**

look at the monitor[1], she could not recall being able to see into the laps of customers who were seated in their vehicles at the menu board. (Id. at p. 6, Handeyside Decl., Ct. Rec. 82, at p. 0007).

At her deposition, Elisa Danen testified that she also did not recall telling Edelbrock that she saw Plaintiff's "naked, erect penis." (Danen Dep. at p. 55, Ex. C to Ct. Rec. 106).[2] Danen says Plaintiff scooted forward in his seat, lifted up, and then Danen "saw a glimpse of something." According to Danen, Plaintiff then started moving up and down in his seat and she could hear grunting noises, leading her to conclude the Plaintiff was masturbating. (Danen Dep. at p. 42, Ex. C to Ct. Rec. 73). Danen testified that the monitor is black and white, and that all she recalls seeing is something "lighter colored, and it was straight and longish." (Danen Dep. at p. 43, Ex. B to Ct. Rec. 23). In "hindsight," Danen says that "maybe" what she saw was the Plaintiff's penis. (Danen Dep. at p. 80, Ex. C to Ct. Rec. 73). In her interview with defense investigator Pulver, Danen says she "couldn't really tell what was in [Plaintiff's] hands, but . . . it looked like a cell phone but I don't know if that's what it really was." (Danen Interview at p. 4, Pulver Declaration, Ct. Rec. 105 at p. 25). Danen told Pulver she did not know if she saw the Plaintiff's penis. (*Id*. at p. 6). At her deposition, Danen testified the reason she asked Ruff to come over and assist her was not because she "saw

---

[1] This monitor provides a view of a car that is parked at the store's menu board/ordering screen. With regard to this particular Airway Heights Starbucks store, the monitor was first activated on January 27, 2007, the date of the incident in question. Plaintiff raises an issue whether the alleged exposure occurred at the menu board/ordering screen, or at the drive-up window where the order is picked up and paid for. This issue is discussed *infra*.

[2] Danen testified she could not recall if Edelbrock asked her any questions, (Danen Dep. at p. 54, Ex. C to Ct. Rec. 73), although she recalls volunteering that she had also seen what had happened involving the Plaintiff.

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    5**

something," but rather the delay in Plaintiff leaving the menu board and proceeding to the pick-up window. (Danen Dep. at p. 36, Ex. C to Ct. Rec. 82). In her post-deposition declaration (Ct. Rec. 121), Danen[3] now says she "realized that the object in [Plaintiff's] hand was likely his penis."

During her interview with Pulver, Pamela Siegel stated she could not remember seeing the Plaintiff's penis, nor could she recall Ruff or Danen stating at the time that they had seen the Plaintiff's penis. (Siegel Interview at p. 8, Pulver Decl., Ct. Rec. 105 at p. 17).[4]  Siegel says she did not "directly" speak to Edelbrock when he arrived at the store in response to Ruff's 9-1-1 call. (*Id.*).

Indecent exposure requires "exposure" and a jury could reasonably conclude that, at most, the information Edelbrock obtained prior to his arrest of the Plaintiff, was that: 1) Plaintiff simulated masturbation without exposing himself[5]; or 2) that he lifted up from the seat to get his wallet, did so repetitiously because of his obsessive compulsive disorder (OCD), made certain facial expressions and grunted in doing so, and the female employees of Starbucks wrongly concluded that Plaintiff was masturbating.  In his declaration (Ct. Rec. 102), Plaintiff states

---

[3]  Danen has since married and her married name is "Neiswender" as reflected in her declaration.

[4]  To the extent Defendants assert that the transcript of the investigator's interview with Siegel is hearsay, it is noted that the Starbucks Defendants rely on the investigator's interview of Ruff in support of their motion for summary judgment (Ex. G to Ct. Rec. 82).  Indeed, Defendants describe the Ruff transcript as a "certified" transcript.  All three transcripts of the investigator's interviews with Ruff, Danen, and Siegel are "certified," and Pulver has authenticated that a true and correct copy of each transcript is appended to his declaration.  Hugh Handeyside, Esq., counsel for Starbucks Defendants, has authenticated that a true and correct copy of the Ruff transcript is appended to his declaration (Ct. Rec. 82).

[5]  There is nothing to indicate this constitutes a crime under Washington law.

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    6**

1  that his OCD causes him to "to make repetitive, ritualistic movements when

2  engaged in simple tasks such as getting money from [his] wallet or using [his]

3  phone."  According to Plaintiff, when he returned to Starbucks on January 27,

4  2007 to pick up his coffee and was told the amount of his order, he realized that

5  the amount of money he had sitting in the console of his truck was not enough to

6  pay for the order and so he got out his wallet.  Plaintiff adds that he believes he

7  was also manipulating his cell phone at the time, even though he was not making

8  or answering a call at the time.  Ronald M. Klein, Ph.D., confirms that Plaintiff has

9  been diagnosed with OCD, a condition which is "characterized by ritualistic and

10 repetitive behaviors."  (Klein Declaration, Ct. Rec. 103).

11      In his police report prepared on January 28, 2007 (Ex. G to Ct. Rec. 73), and

12 in his deposition testimony (Edelbrock Dep. at pp. 24-28, Ex. A to Ct. Rec. 73),

13 Edelbrock states unequivocally that all three women (Ruff, Danen and Siegel) saw

14 the Plaintiff raise his hips off the seat of his truck, expose his naked erect penis,

15 and begin masturbating.  Edelbrock testified at his deposition that the women told

16 him they had witnessed the incident through a monitor connected to a camera in

17 the store. (Edelbrock Dep. at pp. 28-31).  Edelbrock did not take a written

18 statement from any of the three women.  (*Id*. at p. 37) and he apparently assumed

19 there had a been a video recording of the incident, because he acknowledges he

20 was not told by anyone that there would be a recording of what was on the

21 monitor.[6]  He says he asked for a copy of the tape, but Ruff did not know how to

22 retrieve it and would need to ask her manager about it.  (*Id*. at p. 38).  Asked why

23 he believed he had probable cause to arrest the Plaintiff for three counts of

24 indecent exposure, Edelbrock testified: "I had three statements from the girls all

25 saying it occurred, and I believed I had – I would be getting a copy of a tape

26 _____

27      [6] Ruff does not recall telling any law enforcement officer that the incident
28 had been captured on videotape.  (Ruff Dep. at p. 59, Ex. D to Ct. Rec. 73).

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    7**

showing it recorded" and "[t]hey were all claiming that he exposed his sexual genitals, [and] that they were offended by it." (*Id*. at p. 39). Edelbrock's assumption there was a recording turned out to be wrong; Siegel says she did not see the Plaintiff's penis and does not recall Danen and Ruff telling Edelbrock they had seen Plaintiff's penis; Danen is less than sure that she saw the Plaintiff's penis and does not recall telling Edelbrock that is what she saw; and Ruff, although certain she did see the Plaintiff's penis, cannot recall what she told Edelbrock.

After leaving the Starbucks store, Edelbrock drove out to where Deputy Brandon Armstrong had stopped the Plaintiff's vehicle. Edelbrock informed Plaintiff he was under arrest for three counts of indecent exposure. Edelbrock testified that although the Plaintiff claimed he was innocent, he (Edelbrock) did not want to hear Plaintiff's side of the story because "I didn't think he had enough to tell me to compel me to think that those three other statements [from the three women at the store] were so biased that I wouldn't have probable cause to arrest him anyhow." (*Id*.at p. 42).

In his police report, Edelbrock stated that at the time of Plaintiff's arrest, he noticed that the Plaintiff "apparently was still effected (sic) by his erection, even with the time lapse." (Ex. G to Ct. Rec. 73). Asked at his deposition whether he had mentioned this to anybody else at the time, Edelbrock stated he "believed" he had mentioned it to Deputy Armstrong. (*Id*. at p. 46). Deputy Armstrong, however, mentioned no such thing in his report prepared January 28, 2007 (Ex. F to Ct. Rec. 73), and at his deposition, he testified that he did not notice if Plaintiff had an erection. (Armstrong Dep. at pp. 56-57, Ex. J to Ct. Rec. 106).

While the trier of fact may ultimately conclude that the Starbuck's employees "must have" reported sufficient information to Deputy Edelbrock to support his probable cause determination, the court is precluded in deciding a motion for summary from weighing the evidence where factual disputes exist on material issues. Based on the foregoing, the court concludes there is a genuine

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    8**

issue of material fact whether Edelbrock had probable cause to arrest the Plaintiff for indecent exposure.[7]  This is so regardless of Edelbrock's subjective intentions and whether he was engaged in any conspiracy with Ruff to fabricate evidence against the Plaintiff.  Specific intent is not required to establish liability under 42 U.S.C. Section 1983 for false arrest.  *Caballero v. City of Concord*, 956 F.2d 204, 206 (9th Cir. 1992).  It is not necessary to establish that an officer intended to violate the Defendant's Fourth Amendment right to not be arrested without probable cause.  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable [arrest]; nor will an officer's good intentions make an objectively unreasonable [arrest] constitutional."  *Id.*, quoting *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865 (1989).

### 2.  Malicious Prosecution/Due Process (Defendant Edelbrock)

The Plaintiff asserts a "Due Process" claim against Edelbrock which this court construes as a malicious prosecution claim under 42 U.S.C. Section 1983.  Malicious prosecution with the intent to deprive a person of equal protection of the law or otherwise subjecting a person to a denial of constitutional rights is cognizable under Section 1983.  *Poppell v. City of San Diego,* 149 F.3d 951, 961 (9th Cir. 1998) (*citing Usher v. City of Los Angeles*, 828 F.2d 556, 562 (9th Cir. 1987)).  To establish a constitutional claim of malicious prosecution, a plaintiff must present evidence that he was prosecuted (1) with the purpose of denying him

---

[7]  The court is not persuaded by Plaintiff's argument that there was no probable cause to arrest him for indecent exposure because he did not know he could be seen by a camera while he was parked at the menu board.  Even if there was not a camera, Plaintiff was sitting in his vehicle in a very public place and therefore, **if** he exposed his penis, it would still be an "open and obscene exposure" of his person "knowing that such conduct is likely to cause reasonable affront or alarm."

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    9**

a constitutional right, and (2) with malice and without probable cause.  *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995).  See also *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004).  Malicious prosecution actions are not limited to actions against the prosecutor.  They may be brought against those persons who wrongfully caused the charges to be filed.  *See Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126-27 (9th Cir. 2002).

An individual has a clearly established federal constitutional due process right not to be subjected to criminal charges on the basis of false evidence.  See *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001).  For a malicious prosecution claim to be successful, not only must there be evidence of a lack of probable cause, there must be evidence that the criminal proceedings were commenced with malice.  "Malice" is a distinct element of a malicious prosecution claim, although it may be inferred from a lack of probable cause.  The "malice" element may be satisfied by proving that the prosecution complained of was undertaken from improper or wrongful motives or in reckless disregard of the rights of the plaintiff.  *Bender v. City of Seattle*, 99 Wn.2d 582, 594, 664 P.2d 492 (1983), citing *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 502, 125 P.2d 681 (1942).  See also *Peterson v. Littlejohn*, 56 Wn.App. 1, 10, 781 P.2d 1329 (1989).  A malicious prosecution claim under Section 1983 is based on state law elements.  *Usher*, 828 F.2d at 562.

Because there is a genuine issue of material fact regarding the existence of probable cause, the court concludes there is also a genuine issue of material fact whether Deputy Edelbrock acted with malice, that being with an improper or wrongful motive, or in reckless disregard of Plaintiff's constitutional due process rights not to be subjected to criminal charges on the basis of false evidence.

//

//

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    10**

1

### 3. Civil Conspiracy Re False Arrest, False Imprisonment and Malicious

2

### Prosecution (Defendants Edelbrock, Leslie Ruff and Starbucks)

3

4

#### a. Ruff

5

A private individual, like Leslie Ruff, may be liable under Section 1983 if

6

she conspired or entered joint action with a state actor, such as Deputy Edelbrock.

7

*Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002). The plaintiff must show "an

8

agreement or 'meeting of the minds' to violate constitutional rights." *Id.* quoting

9

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th

10

Cir. 1989). "To be liable, each participant in the conspiracy need not know the

11

exact details of the plan, but each participant must at least share the common

12

objective of the conspiracy." *Id.*, quoting *United Steelworkers*, 865 F.2d at 1541.

13

A plaintiff need not provide direct evidence of an agreement between conspirators.

14

In order to survive summary judgment, a plaintiff must offer circumstantial

15

evidence sufficient for a jury to infer from the circumstances that the alleged

16

conspirators reached an understanding to achieve the conspiracy's objectives.

17

*Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1301-02

18

(9th Cir. 1999).[8]

19

Plaintiff's Amended Complaint alleges the object of the conspiracy between

20

_____

21

[8] Defendant Ruff cites to several cases for the proposition that where the

22

facts and circumstances relied upon to establish a conspiracy are just as consistent

23

with a lawful or honest purpose as with an unlawful undertaking, those facts and

circumstances are insufficient to establish a civil conspiracy. None of the cases

24

cited, however, are 42 U.S. C. Section 1983 cases relying on federal law regarding

25

civil conspiracy. *Robinson v. Stevens*, 249 F.2d 731, 733 (9th Cir. 1957)(relying on

26

Washington state law regarding civil conspiracy); *Scully v. U.S. Wats, Inc.*, 238

F.3d 497, 516 (3rd Cir. 2001)(relying on Pennsylvania law regarding civil

27

conspiracy); and *Sterling Bus. Forms, Inc. v. Thorpe*, 82 Wn.App. 446, 451, 918

28

P.2d 531 (1996)(relying on Washington state law).

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    11**

Ruff and Edelbrock was to have Plaintiff arrested and charged with three counts of indecent exposure and to generate publicity about the alleged exposure in order to direct public attention toward the Plaintiff and away from a previous incident in which a sheriff's deputy (Joseph Mastel) had been terminated for exposing himself to a female barista at an Airway Heights coffee stand. The "Mastel incident" occurred in June 2006. In early January 2007, the Spokane County Civil Service Commission ruled that Mastel had been improperly fired and directed that he be rehired and placed on unpaid leave pending his retirement. (Exs. E and F to Ct. Rec. 106). Just a few weeks after the decision by the Civil Service Commission, the incident with the Plaintiff occurred.

In his summary judgment papers, Plaintff contends there was another conspiratorial objective which was that Ruff grew tired of dealing with the Plaintiff (a regular customer of the Airway Height Starbucks store) and conspired with Edelbrock to have the Plaintiff arrested and prosecuted on false charges so that he could no longer frequent the Starbucks store managed by Ruff.

Leslie Ruff is married to Spokane County Sheriff's Deputy Chad Ruff. Deputy Edelbrock knows Deputy Ruff. Edelbrock supervises the SWAT team of which Deputy Ruff is a member. Edelbrock testified that on a slow month, he may have contact with Deputy Ruff twice, and during a busy week, he may have contact with him three times. (Edelbrock Dep. at pp. 15-16, Ex. A to Ct. Rec. 73). Edelbrock met Leslie Ruff two Christmases ago at an office Christmas party (Christmas 2005 or 2006), and had contact with her when the Airway Heights Starbucks store first opened when she made a point of coming up to the drive through window and introducing herself. (*Id*. at 16-17).[9] These contacts preceded

---

[9] Ruff has a different recollection. She claims the first time she met Edelbrock was on the day of the incident (January 27, 2007). (Ruff Dep. at p. 7, Ex. D to Ct. Rec. 73).

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    12**

the January 2007 incident involving the Plaintiff.  Edelbrock testified he is familiar with Deputy Mastel and that it is likely he had contact with him "many years ago."  (*Id*. at 17).  Edelbrock denied having any discussions in January 2007 with either Chad or Leslie Ruff concerning Deputy Mastel.  (*Id*. at 17-18).

Plaintiff suggests the manner in which Edelbrock responded to dispatch, the briefness of his visit to the Starbucks store after the incident had been called into dispatch, and certain inconsistencies in his written report, suggest Plaintiff was set up and that his arrest was already a foregone conclusion.  Ruff called 9-1-1 at 4:30 p.m. (1630) and Edelbrock and Armstrong responded to the call.  (Ex. D to Ct. Rec. 106).  Ruff requested that an officer come to the store.  (Sullivan Dep. at p. 21, Ex. K to Ct. Rec. 106).  According to Armstrong's police report, he and Edelbrock activated the emergency lights on their vehicles to clear the intersections of Highway 2 which are controlled with traffic lights which happened to be red at the time.  (Ex. F to Ct. Rec. 106).  Emergency response was, however, apparently not requested by dispatch.  Edelbrock went to the Starbucks store, while Armstrong went to the location where Plaintiff's vehicle had been stopped by an Airway Heights police officer.

Edelbrock's police report (Ex. G to Ct. Rec. 106) states that "[t]oday after buying his coffee **at the drive thru window** Doug raised his hips off the seat of his truck exposing his erect penis that he began masturbating."  (Emphasis added). Armstrong's report also states that Ruff had reported to dispatch that Plaintiff was "exposing himself and masturbating while **at the drive through window**."  (Emphasis added).  At his deposition, Edelbrock testified he must have gotten that information from one of the three women at Starbucks (Edelbrock Dep. at p. 33, Ex. A to Ct. Rec. 73), although the three women testified that the incident occurred at the menu board, which is distinct from the drive through window and located in the drive through lane prior to the drive through window.  The dispatch report (Computer Assisted Dispatch (CAD) printout) indicates that Ruff's 9-1-1

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    13**

call reported a "BLK TRUCK IN DRIVE THRU AT THE WINDOW IS MASTERBATING . . . STILL THERE."  (Ex. D to Ct. Rec. 106).  While Plaintiff suggests Ruff deliberately reported that the masturbation occurred at the window, as opposed to at the menu board, it is just as likely that by the time Ruff placed the 9-1-1 call, Plaintiff had driven his vehicle from the menu board to the drive through window.  Edelbrock and Armstong would have heard from dispatch that the alleged masturbation occurred at the drive through window, and based on what is contained in their subsequently prepared reports, nothing they heard from the female employees of Starbucks, or saw at the Starbucks store, altered their assumption that the alleged masturbation occurred at the window.  There is no testimony or statement from Ruff, Danen or Siegel that they told Edelbrock that the incident occurred at the drive through window, as opposed to at the menu board.  (Ruff Dep. at p. 56, Ex. D to Ct. Rec. 73; Pulver Interview with Ruff at p. 8, Ex. A to Ct. Rec.  105; Danen Dep. at p. 55, Ex. G to Ct. Rec. 106).  It is a reasonable possibility that Edelbrock and Armstrong simply did not make a distinction between the menu board and the drive through window, and what specific cameras pertained to each of these respective locations.  (See Armstong Dep. at p. 60, Ex. B to Ct. Rec. 73).

Plaintiff contends there is more to this in that Ruff and Edelbrock agreed in advance that the story would be that Plaintiff exposed himself and masturbated while seated in his vehicle at the drive through window, that is what Ruff told Edelbrock when he arrived at the store on January 27, 2007, and that Ruff was subsequently forced to change her story when she realized there was  a video recording from the security camera directed at the drive through window and it would not corroborate her assertion that Plaintiff had exposed himself and masturbated at the window.  Plaintiff's theory is that Ruff subsequently stated the incident occurred at the menu board because she realized there was no video recording available of the menu board to disprove her assertion that Plaintiff

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    14**

exposed himself and masturbated while sitting in his vehicle at the menu board.

The window/menu board discrepancy does nothing to bolster Plaintiff's conspiracy theory. First, there is no allegation that Danen and Siegel were involved in a conspiracy against Plaintiff. Like Ruff, they contend the incident occurred at the menu board and they never told Edelbrock anything to the contrary. It also is difficult to believe that Ruff, as store manager, did not know that transactions at the drive through window are recorded for security purposes, assume there would be no recording, and conclude she could safely and falsely accuse the Plaintiff of exposing himself and masturbating at the window. If she knew there would be a recording of what transpired at the window, it makes no sense that she would claim the incident occurred at the window, as opposed to at the menu board where there was no recording, a fact of which she may have been aware on January 27, 2007.

Edelbrock's police report states that "[t]he 3 women told me that the suspect was a regular customer they knew as Doug. Leslie [Ruff] described his past behavior as 'strange' saying that he has made inappropriate comments to employees in the past." At his deposition, Edelbrock testified that he could not recall if Ruff explained what she meant by "strange," nor could he recall if he asked her to explain what she meant. (Edelbrock Dep. at p. 35, Ex. A to Ct. Rec. 73). Edelbrock testified he was not sure how long he was at the Starbucks store and that he did not feel he needed written statements from the women. (*Id*. at pp. 37-38). Plaintiff contends Edelbrock was at the Starbucks store for only two or three minutes before he left to join Deputy Armstrong at the scene where Plaintiff's vehicle had been stopped. It appears Plaintiff arrives at that conclusion because of the computer assisted dispatch (CAD) printout (Ex. D to Ct. Rec. 106) which shows Edelbrock ("A612") was "onscne" (on scene) at 4:35 p.m. (1635), the assumption being that "on scene" means where Plaintiff's vehicle had been stopped, not the Starbucks store. 4:35 p.m. was only four minutes after Edelbrock

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    15**

had received the call from dispatch.  The CAD printout indicates that Plaintiff was taken into "custody" at 1640 (4:40 p.m.) and it appears that Edelbrock is the one who placed Plaintiff under formal arrest.[10]  At 1647 (4:47 p.m.), the CAD printout indicates Edelbrock requested a tow for Plaintiff's vehicle and that he radioed in that Plaintiff was known to the Starbucks people.  Armstrong estimated that only between three and five minutes elapsed from the time he took Plaintiff into "custody" and when Edelbrock arrived at the scene.  (Armstrong Dep. at p. 32, Ex. B to Ct. Rec. 73).

Plaintiff seemingly suggests Deputy Armstrong was somehow involved in the alleged conspiracy, but Armstrong is not named as a defendant in this action. Plaintiff says Armstrong placed him under arrest immediately upon coming into contact with him; that Armstrong claimed he had information from Edelbrock to establish probable cause to arrest Plaintiff for indecent exposure, but there is no documentary record of how Armstrong obtained that information; and Armstrong told Plaintiff that his actions at the store had been recorded on video, but there is no documentary evidence of how Armstrong would have obtained that information.  It is unclear what Plaintiff means by "documentary" evidence and if there should be such evidence.  The CAD printout apparently does not show any radio transmissions between Edelbrock (while he was at the Starbucks store) and Armstrong while he was at the scene where Plaintiff's vehicle was stopped, but there is no indication that the CAD printout would contain such transmissions, rather than just the transmissions between the individual officers and dispatch. Armstrong arrived at the scene where Plaintiff's vehicle had already been stopped by an Airway Heights police officer.  Armstrong testified at his deposition that the vehicle matched the description which had been provided to him by dispatch and

---

[10]  Although Armstrong's police report suggests he had already placed the Plaintiff under arrest prior to Edelbrock's arrival.  (Ex. F to Ct. Rec. 106).

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    16**

subsequently by Leslie Ruff during a cell phone call that Armstrong made to Ruff while Armstrong was en route to the Starbucks store in response to the dispatch, but before he detoured and went to the site where Plaintiff's vehicle had already been stopped by the Airway Heights police officer.  (Armstrong  Dep. at  p. 26, Ex. B to Ct. Rec. 73; Armstrong Report, Ex. F to Ct. Rec. 73).  Armstrong testified that he believed he certainly had enough information to justify a *Terry* stop of Plaintiff's vehicle and person, even absent probable cause to arrest.[11]  (Armstrong Dep. at p. 29, Ex. B to Ct. Rec. 73).  Plaintiff apparently does not dispute this and perhaps that it why Armstrong is not named as a defendant.  Moreover, there is no doubt that Edelbrock could have communicated to Armstrong over the radio that he had statements from three female Starbucks employee and that there was video of the incident which, according to Armstrong's report, is information he relayed to Plaintiff prior to Edelbrock's arrival.  This is what Edelbrock and Armstrong say occurred.  (Edelbrock Dep. at pp. 38-39 and 50, Ex. A to Ct. Rec. 73; Armstrong Dep. at p. 28, Ex. B to Ct. Rec. 73).

Leslie Ruff testified at her deposition that she was aware of the incident involving a sheriff's deputy (Mastel) exposing himself to a female barista, but she did not recall when the incident happened, nor could she recall the name of the deputy.  (Ruff Dep. at p. 9, Ex. D to Ct. Rec. 73).  It is undisputed that on occasions prior to January 27, 2007, Plaintiff had made racial and sexual comments to the female help at the Airway Heights Starbucks store which the help considered offensive.  Danen testified she preferred not to wait on the Plaintiff.  (Danen Dep. at p. 66, Ex. G to Ct. Rec. 73).  In her interview with defense investigator Pulver, Danen stated that Plaintiff would call the baristas "baby" and "sweetheart," and that they fought over who would have to wait on him.  (Interview at p. 3, Ex. C to Ct. Rec. 105).  Ruff acknowledged that sometime

_____

[11]  *Terry v. Ohio*, 392 U.S. 1 (1968).

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    17**

between May 2006 and January 2007, she had cited Plaintiff to Starbucks' management as an example of customers sexually harassing employees. (Ruff Dep.at pp. 32-33, Ex. H to Ct. Rec. 106). During her interview with defense investigator Pulver, Ruff stated that Plaintiff was a regular customer, would come through the drive-through on a regular basis, that she would have seen him once every other week, that she knew his name, knew he always got a tall coffee and bought whole bean coffee, and that he had made inappropriate comments to the female baristas. (Interview at p. 3, Ex. A to Ct. Rec. 105). Ruff also knew "something was a little off with him" in that sometimes after placing an order, he would delay pulling up to the drive-through window. According to Ruff, they would have to ask Plaintiff "a couple of times" to pull up to the window and "[t]hen when he'd get to the window, sometimes he would do things like he would count his money more than once, he would tap his dashboard, he would tap his leg . . . it would take him while to like get his transaction done." (*Id.*).

Danen told Investigator Pulver, and apparently it is undisputed, that the camera and monitor system for the menu board was set up the very day of the incident in question. According to Danen, it was set up just a half an hour before Plaintiff came through the drive-through. Plaintiff made two trips through the drive-through that day and so it is not clear whether the camera got set up a half hour before his first trip, or a half an hour before his second trip during which the incident occurred. On his first trip through, the Plaintiff ordered a pound of whole bean coffee which he asked be ground for him, and stated he would then return and pick up the ground coffee. (Interview at p. 4, Ex. C to Ct. Rec. 105).

Ruff testified at her deposition that she could not recall if Plaintiff had made an earlier trip through the drive-through to order a pound of coffee. (Ruff Dep. at p. 38). During her interview with Pulver, however, Ruff unequivocally stated that "Doug had called ahead that he wanted some whole bean coffee ground for him so we had that ready and knew he was coming." (Interview at p. 5). Ruff also told

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    18**

Pulver that the video had been installed "two or three hours before he got there."
(*Id.*). Ruff's use of the term "Doug" indicates that she was very familiar with the
Plaintiff and his behavior.

The Plaintiff does not need direct evidence to raise a genuine issue material
fact regarding the existence of a conspiracy between Edelbrock and Ruff. Nor is it
necessarily fatal that Plaintiff has not offered any evidence of a specific
communication between Edelbrock and Ruff prior to Ruff's 9-1-1 call on January
27, 2007. That said, the absence of such evidence is a factor the court must
consider. The court concludes as a matter of law that Plaintiff has not offered
sufficient circumstantial evidence to raise a genuine issue of material fact that
Edelbrock and Ruff conspired to fabricate a criminal charge against the Plaintiff.
In other words, the circumstantial evidence presented does not rise above the level
of speculation that there was a conspiracy. There is no evidence that Ruff's
husband, Deputy Chad Ruff, or for that matter, Deputy Edelbrock had a close
enough relationship to Mastel, or were so embarrassed by the incident involving
him, that they would have been willing to hatch a scheme to have a private citizen
criminally charged with the same type of conduct. Besides that, such a scheme
would not have had a realistic chance of achieving its intended purpose (deflecting
attention from the sheriff's department). While there is some evidence suggesting
Ruff had reasons for growing weary of dealing with the Plaintiff, the totality of the
evidence is insufficient to raise a genuine issue of material fact that she conspired
with Edelbrock to have the Plaintiff legally "trespassed" from the Starbucks store
so he could no longer return to the store.

As discussed *supra*, however, the fact the evidence is insufficient to raise a
genuine issue of material fact that there was a conspiracy does not mean the
evidence is insufficient to preclude a jury from finding that Deputy Edelbrock is
liable in his own right for false arrest, false imprisonment and malicious
prosecution of the Plaintiff because he lacked probable cause. Moreover, the

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    19**

evidence is sufficient to raise a genuine issue of material fact whether Ruff intentionally misled Edelbrock that there was exposure so that in addition to, or instead of Edelbrock, Ruff should be held liable in her own right on common law claims of false arrest, false imprisonment, and malicious prosecution.[12]  In other words, a jury could find that Ruff had a motive and an opportunity to make a false criminal allegation against the Plaintiff and that she did so of her own accord without any cooperation from law enforcement.  Of course, it is also very possible that the trier of fact will find that there is no liability on the part of either Edelbrock or Ruff.  The question of liability on the part of Edelbrock and/or Ruff depends, at least in part, on an assessment of their credibility.  The jury determines credibility at trial.  That is not for the court to determine on summary judgment.

### b. Starbucks

Because there is insufficient circumstantial evidence to raise a genuine issue of material fact that Ruff or any other Starbucks employee conspired with Edelbrock to violate Plaintiff's constitutional rights, it follows that there is no possible basis for finding Starbucks liable for civil conspiracy.  In any event, Starbucks, as Ruff's employer, cannot  be held liable under 42 U.S.C. Section 1983 on the basis of *respondeat superior*.  The Supreme Court has not distinguished between government and private corporate entities and has stated unequivocally that "respondeat superior or vicarious liability will not attach under §1983."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1204 (1989).  Courts have treated private corporate entities the same as government entities in holding that a private corporate entity can only be held liable under

---

[12]  If Ruff intentionally misled Edelbrock about there being exposure, that would still not necessarily preclude Edelbrock's potential liability for objectively lacking probable cause.

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    20**

1    Section 1983 for its own unconstitutional policies or customs that are a driving

2    force behind the constitutional violations.  *Stanley v. Goodwin*, 475 F.Supp.2d

3    1026, 1038 (D. Hawai'i 2006), citing *Sanders v. Sears, Roebuck & Co.*, 984 F.2d

4    972, 975 (8th Cir. 1993), and *Otani v. City and County of Hawaii*, 126 F.Supp.2d

5    1299, 1306-07 (D. Haw. 1998).

6

7        **4.  Fourth Amendment Claim For Excessive Force (Defendants**

8            **Edelbrock and Spokane County)**

9

10        **a.  Edelbrock**

11        Determining whether an officer's use of force was "reasonable" under the

12    Fourth Amendment "requires a careful balancing of the nature and quality of the

13    intrusion on the individual's Fourth Amendment interests against the

14    countervailing government interests at stake."  *Graham v. Connor*, 490 U.S. 386,

15    396, 109 S.Ct. 1865 (1989).  This analysis requires "careful attention to the facts

16    and circumstances in each particular case, including the severity of the crime at

17    issue, whether the suspect poses an immediate threat to the safety of the officers or

18    others, and whether he is actively resisting arrest or attempting to evade arrest by

19    flight."  *Id*.  Courts must examine the circumstances from the viewpoint of the

20    reasonable officer on the scene, "rather than with the 20/20 vision of hindsight."

21    *Id*.  "The calculus of reasonableness must embody allowance for the fact that

22    police officers are often forced to make split-second judgments-  in circumstances

23    that are tense, uncertain, and rapidly evolving- about the amount of force that is

24    necessary in a particular situation."  *Id*. at 396-97.

25        Plaintiff says he was handcuffed while sitting in Armstrong's patrol car

26    when Edelbrock removed him from Armstrong's car, intending to place the

27    Plaintiff in the back of Edelbrock's patrol car.  According to Plaintiff, because he

28    had his hands behind his back and was handcuffed, "[i]t was hard for [him] to

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    21**

stoop down with [his] hands behind [his] back, and Edelbrock was not happy with [him]." (DiBiasi Dep. at p. 346, Ex. E to Ct. Rec. 73). Plaintiff says that Edelbrock used excessive force in getting Plaintiff into the car, specifically that he "used his right forearm as a combination throat/upper throat choke hold to my throat cutting off my circulation to my throat and my air passageway, my throat, which was unnecessary because I was not resisting arrest." (*Id.*). Plaintiff claims Edelbrock "slammed" his right forearm into Plaintiff's throat . (*Id.* at p. 640). Plaintiff says his neck was slammed into the back of car and that Edelbrock was "shaking" with rage when he was doing this and told the Plaintiff he was really "pissing" him (Edelbrock) off. (*Id.* at 641). Plaintiff says his air passageway was cut off for between 45 to 50 seconds. (*Id.*). Plaintiff asserts he had a neck injury that pre-existed the alleged excessive force incident, (an injury for which he previously had surgery), but says he does not think he told Edelbrock about that injury. (*Id.* at pp. 640-41, 651).

Edelbrock claims he used a "modest amount of direct physical direction" in placing the Plaintiff in his (Edelbrock's) patrol car. (Edelbrock Dep. at p. 66, Ex. A to Ct. Rec. 73). Edelbrock says he "reached up behind [Plaintiff's] neck with my left arm and pressed with my left elbow against his chest to help fold his body, get his direction going down towards the seat." (*Id.*). Edelbrock says the Plaintiff was "trying to be rigid and not go into the back of the car." (*Id.*). According to Edelbrock, once the Plaintiff was in the car, he told the Plaintiff to look to his left and reached across the Plaintiff's chest and neck with his (Edelbrock's) left arm "to hold his [Plaintiff's] right cheek to the side, and seat-belted him in." (*Id.* at pp. 68-69). This is a safety measure to prevent the detainee from spitting or biting the officer. (*Id.*). Edelbrock says he used "minimal" force in doing this. (*Id.*).

The court finds there is a genuine issue of material fact whether Edelbrock used excessive force on the Plaintiff, thereby precluding summary judgment for Edelbrock on this claim. The crime at issue was not severe (indecent exposure),

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    22**

Plaintiff did not pose an immediate threat to the safety of officers or others, and there is no evidence that he was actively resisting arrest or attempting to evade arrest by flight.  In *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1198 (9th Cir. 2002), the Ninth Circuit Court of Appeals affirmed summary judgment for defendants where a pre-trial detainee, at the moment he arrived at the jail, began struggling against the deputies, hurling invective, and generally behaving very strangely and violently.  Here, there is no evidence that Plaintiff was doing any of this, and apparently at most he was being "rigid," something which the Plaintiff attributed to the fact he was handcuffed with his hands behind his back.  A triable issue of fact exists as to excessive force if, viewing the evidence in the light most favorable to the plaintiff, it appears that officers used excessive force on an arrestee after he has surrendered, or is otherwise helpless, and is under the complete control of the officers.  *Barnard v. Las Vegas Metropolitan Police Dept.*, 2009 WL 277044 (9th Cir. 2009), citing *LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000).

The fact Plaintiff did not seek medical attention after the incident, nor suffer any permanent injury, while relevant to the excessive force inquiry, does not preclude a jury from finding that force used by Edelbrock was excessive.  If a jury finds the force used was excessive, but there is no basis for awarding the Plaintiff compensatory damages (because there is no actual proven injury), the jury can still award nominal damages to the Plaintiff for the violation of his constitutional rights.  *Carey v. Piphus*, 435 U.S. 247, 266-67,  98 S.Ct. 1042 (1978).

### b.  Spokane County

With regard to Defendant Spokane County, excessive force is the only claim the Plaintiff is pursuing pursuant to 42 U.S.C. Section 1983.

A municipality or governmental entity cannot be found liable under 42 U.S.C. §1983 on a *respondeat superior* theory.  *Monell v. New York City Dep't of*

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    23**

1    *Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018 (1978).  Municipal liability must

2    be established in one of the following ways:  1) by proving that a "city employee

3    committed the alleged constitutional violation pursuant to a formal governmental

4    policy or longstanding practice or custom which constitutes the standard operating

5    procedure of the local governmental entity;" 2) by establishing that the "individual

6    who committed the constitutional tort was an official with final policy-making

7    authority and that the challenged action itself thus constituted an act of official

8    governmental policy;" or 3) by proving that "an official with final policymaking

9    authority ratified a subordinate's unconstitutional decision or action and the basis

10   for it.*"  Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992).

11          Plaintiff contends that because the County asserts that what Edelbrock did is

12   a "common practice," it constitutes a *de facto* policy for which the County should

13   be held responsible.  According to the County "[t]he action used by Deputy

14   Edelbrock is a common practice to assist individuals into getting into the back of

15   the police vehicles" and [a]fter placing a suspect in the back of a patrol vehicle, he

16   then has them look to the left so that the suspect does not bite or spit on the

17   officer."  (Ct. Rec. 75 at p. 20).  It is apparent that the "common practice" to which

18   the County refers does not involve "slamming" a forearm into an individual's

19   throat, but rather using reasonable force to place an individual into the back of a

20   car and buckle him up in a manner so that the officer is protected.  If Edelbrock

21   did what Plaintiff claims he did, that is clearly not the "common practice" of

22   Spokane County.

23          The court will grant summary judgment to Spokane County on Plaintiff's

24   excessive force claim.

25

26          **5.  Qualified Immunity (Defendant Edelbrock)**

27          The doctrine of qualified immunity protects government officials "from

28   liability for civil damages insofar as their conduct does not violate clearly

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    24**

established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). Qualified immunity balances two important interests:  the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson v. Callahan*, _____ U.S. _____ , 129 S.Ct. 808, 815 (2009).  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.*, quoting *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284 (2004).

In *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001), the Supreme Court mandated a two-step sequence for resolving qualified immunity claims. First, the court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right.  Second, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct.  Even assuming the existence of a constitutional violation, an officer is entitled to qualified immunity if the constitutional right was not clearly established at the time of the alleged violation. The Supreme Court's recent decision in *Pearson* modified the *Saucier* analytical framework so that the decisional sequence required by *Saucier* is no longer mandatory.  A court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818.  When determining whether a constitutional right was clearly established, a court must look to the "specific context of the case," and not just "broad general propositions." *Saucier*, 533 U.S. at 201.

The court has found there are genuine issues of material fact whether Edelbrock falsely arrested, falsely imprisoned, and maliciously prosecuted the

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    25**

Plaintiff.  Assuming Edelbrock committed these constitutional violations, the question is whether he is nonetheless entitled to qualified immunity from damages because the constitutional rights in question were not clearly established at the time of the violations.  The court concludes that in "the specific context" of this case,  Edelbrock is not entitled to qualified immunity.  If it is true that none of the three female Starbucks' employees (Ruff, Danen and Siegel) told Edelbrock that Plaintiff had exposed himself, and Edelbrock assumed, without verifying, that there was a video recording of the incident, a reasonable officer would have or should have known that he lacked probable cause to arrest, imprison and prosecute the Plaintiff for indecent exposure.  In other words, a reasonable officer could not have made a good faith mistake under those circumstances because he either would have known he did not have probable cause (knew what he was doing was unlawful), or should have known that he did not have probable cause (thought what he was doing was lawful), but proceeded with  recklessness or gross negligence to arrest, imprison and prosecute the Plaintiff.  Such conduct violates clearly established constitutional rights of which a reasonable officer would have known.  And clearly, if Edelbrock deliberately fabricated evidence against the Plaintiff, he is not entitled to qualified immunity.  An individual has a clearly established constitutional due process right not to be subject to false charges based on fabricated evidence.  *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001).

The court has found a genuine issue of material fact exists whether Edelbrock used excessive force on the Plaintiff.  Assuming Edelbrock used excessive force on the Plaintiff, the law was clearly established at the time of the incident such that a reasonable officer would have known that the use of such force was unconstitutional.   If it is assumed that Plaintiff was a non-resisting arrestee, as he contends, a reasonable officer would have known there was no need to deliver a forearm to Plaintiff's throat and cut off his air passageway for 45 to 50

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT- 26**

1   seconds.   See *Barnard*, 2009 WL 277044 at *3 ("reasonable officer would have
2   known that it violated clearly established law to use a choke hold on a non-
3   resisting arrestee who had surrendered, pepper-spray him, and apply such knee
4   pressure on his neck and back that it would cause the collapse of five vertebrae in
5   his cervical spine").
6        Considering the state of the evidence, and construing that evidence in the
7   light most favorable to the Plaintiff, the court cannot conclude that Edelbrock is
8   entitled to qualified immunity on any of the federal constitutional claims asserted
9   against him.
10
11       **C.  Common (State) Law Tort Claims**
12       **1.  False Arrest/False Imprisonment (Defendants Edelbrock,  Ruff,**
13       **Starbucks and Spokane County)**
14        Because there is a genuine issue of material fact whether there was probable
15   cause to arrest and imprison the Plaintiff for indecent exposure, summary
16   judgment cannot be granted to Defendants Edelbrock and Ruff on Plaintiffs'
17   common law false arrest and false imprisonment claims, unless there is another
18   independent basis for doing so.  Probable cause is a complete defense to claims of
19   malicious prosecution, false arrest, and false imprisonment.  *Fondren v. Klickitat*
20   *County*, 79 Wn.App. 850, 856, 905 P.2d 928 (1995).  "The gist of an action for
21   false arrest or false imprisonment is the unlawful violation of a person's right of
22   personal liberty or the restraint of that person without legal authority."  *Bender v.*
23   *City of Seattle*, 99 Wn.2d 582, 591, 664 P.2d 492 (1983).
24
25       **a.  Spokane County and Starbucks**
26        In the common law context, if Edelbrock is found to have falsely arrested
27   and imprisoned the Plaintiff for indecent exposure, Spokane County is potentially
28   subject to vicarious liability on the basis of *respondeat superior*.  There are

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    27**

circumstances in which an employer can be held liable for its employees'
intentional torts. *Respondeat superior* imposes liability on an employer for the
torts of an employee who is acting on the employer's behalf. Where the employee
steps aside from the employer's purpose to pursue a personal objective of the
employee, the employer is not vicariously liable. The scope of employment limits
the employer's vicarious liability, but is not a limit on the employer's liability for
breach of its own duty of care. *Niece v. Elmview Group Home*, 131 Wn.2d 39, 48,
929 P.2d 420 (1997). Edelbrock's potential liability for various intentional torts
subjects the City of Spokane to potential vicarious liability for those torts.
Likewise Ruff's potential liability for various intentional torts subjects Starbucks
to potential vicarious liability for those torts.

### b. Ruff

### (1) Liability For False Imprisonment

False arrest and false imprisonment can be distinguished by the manner in
which each cause of action arises. False arrest may be committed only by one who
has legal authority to arrest or who has pretended legal authority to arrest.
Conversely, false imprisonment may exist entirely apart from any purported
process of law enforcement, as by private individuals acting on their own initiative
for their own private purposes without any pretense of legal authority. *Bender*, 99
Wn.2d at 590. For false imprisonment, a plaintiff must prove that the liberty of
his person was intentionally restrained, *Moore v. Pay'n Save Corp.*, 20 Wn.App.
482, 486 (1978), although no actual or pretended legal authority is necessary for a
restraint to constitute false imprisonment. *Bender*, 99 Wn.2d at 590.

Here, the allegation of false imprisonment does not exist apart from the law
enforcement process. Ruff contends, however, that she cannot be held liable for
false imprisonment because she did not personally restrain the Plaintiff through
force or threat of force, and in fact, asked him to leave the Starbucks after the

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT- 28**

January 27, 2007 incident.  Ruff asserts that *Dang v. Ehredt*, 95 Wn.App. 670, 977 P.2d 29 (1999), constitutes authority that in order for her to have falsely imprisoned the Plaintiff, she needed to have personally restrained the Plaintiff through force or threat of force.  In *Dang*, the plaintiff sued a bank and two of its employees for false arrest and imprisonment based on information they relayed to police which resulted in the arrest and imprisonment of the plaintiff.  The Washington Court of Appeals found "no evidence in the record that the bank used or threatened to use force against [plaintiff], or that the bank deprived her of her liberty of movement." *Id*. at 685-86.  Thus, the court of appeals affirmed summary judgment for the bank defendants on the plaintiff's false imprisonment claim.

It is not clear if *Dang* can be read to lay down a firm rule that a person cannot be liable for false imprisonment unless he or she personally, physically restrains another, or personally threatens another with physical restraint.  The court of appeals did not explicitly state such a rule in *Dang*.  And in *Bender*, the Washington Supreme Court noted that Dean Prosser, an eminent authority on torts, has stated that one may be liable for false arrest or false imprisonment even if he or she is not the person who physically restrains the plaintiff.  According to Prosser:

> One who participates in an unlawful arrest, or procures or instigates the making of one without proper authority, will be liable for the consequences; but the defendant must have taken some active part in bringing about the unlawful arrest itself, by some "affirmative direction, persuasion, request or voluntary participation."

*Bender*, 99 Wn. 2d at 592, n. 3, quoting W. Prosser, *Torts*, §11, p. 47 (4th ed. 1971).[13]  Ruff does not argue she cannot be liable for false arrest or malicious prosecution simply because it was Edelbrock who effected the arrest and brought the charges.  Following Ruff's logic regarding why she cannot be held liable for

---

[13] The same quote is in the Fifth Ed., §11 at p. 52 (1984).

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    29**

false imprisonment would seem to require that she also not be held liable for false arrest or malicious prosecution since she is not the one who physically arrested the Plaintiff and she did not file the charges against him.

At this juncture, the court is not convinced that Ruff should be granted summary judgment on the common law false imprisonment claim against her simply because she was not personally, physically involved in restraining the Plaintiff through force or threat of force.

### (2) Immunity Under RCW 4.24.510

Ruff asserts that pursuant to RCW 4.24.510, she is immune from any common law tort claims. RCW 4.24.510 grants immunity to a person who communicates a complaint or information to any branch or agency of federal, state, or local government. Immunity extends to any "claims based upon the communication to the agency or organization regarding any matter reasonably of concern" to that agency.[14] Ruff says she is immune because the common law tort claims asserted against her all arise out of her 9-1-1 call on January 27, 2007.

RCW 4.24.510 is referred to as the "anti-SLAPP statute." "SLAPP" stands for Strategic Lawsuits Against Public Participation. The Anti-SLAPP law was enacted to encourage the reporting of potential wrongdoing to governmental entities. *Gonthmakher v. City of Bellevue*, 120 Wn. App. 365, 366, 85 P.3d 926 (2004). Former RCW 4.24.510 (1999) contained express language that the communication to a governmental agency be made in "good faith," but this language was deleted by way of a 2002 amendment to the statute. Ruff contends

---

[14] Immunity is not limited solely to the communications themselves, but to claims "based upon the communications." "Allowing a cause of action for the events surrounding the communication to the police, while immunizing the communication itself, would thwart the policies and goals underlying the immunity statute." *Dang*, 95 Wn.App. at 683.

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    30**

1    that even if her 9-1-1 call was not made in "good faith" (was made in "bad faith"),

2    she is still entitled to immunity and that the only consequence of a finding of bad

3    faith on her part would be that she might be precluded from receiving an award of

4    statutory damages for prevailing on her anti-SLAPP defense.[15]

5         Plaintiff contends RCW 4.24.510 does not provide absolute and unqualified

6    immunity to those who falsely report a crime (as he alleges Ruff did) because a

7    false report does not involve "potential wrongdoing" and is not a matter

8    "reasonably of concern" to a government agency.  Plaintiff asserts that even prior

9    to the 2002 amendment of RCW 4.24.510, which eliminated the "good faith"

10   language, a plaintiff  had to prove "actual malice," that being knowledge of falsity

11   of the communication or reckless disregard of its falsity, in order to overcome the

12   immunity provided by RCW 4.24.510.  In other words, even under the pre-2002

13   amendment of the statute which contained the "good faith" requirement, it was not

14   the defendant asserting immunity who had to prove "good faith," but rather the

15   plaintiff seeking to overcome the immunity who had to prove "actual malice" by

16   clear and convincing evidence.  This test ensured that the defendant's right to free

17   speech was not unconstitutionally chilled.  *Right-Price Recreation, LLC v.*

18   *Connells Prairie Community Council*, 146 Wn.2d 370, 383-84, 46 P.3d 789

19   (2002).  According to Plaintiff, by removing the "good faith" language from the

20   current version of RCW 4.24.510, the Washington legislature did not change the

21

22   _____

23        [15]  RCW 4.24.510 provides in relevant part:

24        A person prevailing upon the defense provided for in

25        this section is entitled to recover expenses and reasonable
           attorneys' fees incurred in establishing the defense and in

26        addition shall receive statutory damages of ten thousand dollars.
           Statutory damages may be denied if the court finds that the

27        complaint or information was communicated in bad faith.

28

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    31**

substance of the statute as previously applied, but amended the language to reflect what was already the law: that the defendant asserting immunity did not have to prove "good faith," but that the plaintiff seeking to overcome the immunity had to prove "actual malice" by clear and convincing evidence.  Plaintiff asserts that further proof of this is that RCW 4.24.500, which is the "Purpose" section of the Anti-SLAPP law, still provides, even after the 2002 amendment to RCW 4.24.510, that "[t]he purpose of RCW 5.24.500 through 4.24.520 is to protect individuals who make **good-faith** reports to appropriate governmental bodies."  (Emphasis added).        Plaintiff's assertion seems to be that if he has created an issue of material fact that Ruff acted with "actual malice" in making her 9-1-1 call, she is not entitled to RCW 4.24.510 immunity, at least at this juncture.  The Washington Court of Appeals recently handed down a decision in *Segaline v. State Department of Labor and Industries*, 144 Wn.App. 312, 182 P.3d 480 (2008), which, at first glance, seems to dispose of the notion that proof of malice (or the possibility of such proof) in a communication to a government agency will preclude the grant of immunity to the communicating party.  The court of appeals specifically held that RCW 4.24.510 applied to a malicious prosecution claim (of which "malice"is obviously an element).  144 Wn.App. at 326.  On the other hand, the court of appeals did not explicitly state that RCW 4.24.510 provides absolute and unqualified immunity in all circumstances and indeed, made some statements which arguably suggest otherwise.  In *Segaline*, the plaintiff argued that RCW 4.24.510 did not grant absolute immunity because it contained "an implicit requirement of good faith, without which it would be unconstitutional under the First Amendment."[16]   The court of appeals did not reach the constitutional issue

---

[16] The First Amendment does not give an individual the unfettered right to say anything, at anytime, and in anyplace, and there is no constitutional right to defame someone.

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    32**

because it determined it could resolve the matter on non-constitutional grounds and it did so, finding there was no evidence in the record that the communication at issue "was not in good faith."  144 Wn.App. at 324-25.  Here, there is evidence in the record raising a genuine issue of material fact whether Ruff's 9-1-1 call was made in good faith.

In sum, even though RCW 4.24.510 no longer contains an explicit "good faith" requirement, it is unsettled whether the statute still contains an implicit "good faith" requirement and whether it provides absolute and unqualified immunity regardless of the nature of the communication and the motivation behind it.  It is noted that on April 3, 2009, the Washington Supreme Court granted a petition to review the decision of the court of appeals in *Segaline*, perhaps intending to address this issue .  Considering what the court believes to be the unsettled state of the law with regard to the scope of the immunity provided by RCW 4.24.510, it will not, at this point, find as a matter of law that Ruff is entitled to such immunity on any of the state law claims asserted against her, including the malicious prosecution and WLAD claims discussed *infra*.

### 2.  Malicious Prosecution (Defendants Edelbrock, Ruff, Heidi Parr, Starbucks and Spokane County)

The Washington Supreme Court has recognized five separate elements of the common law tort of civil malicious prosecution: (1) defendant initiated or continued the prosecution claimed to have been malicious; (2) the prosecution of the action lacked probable cause; (3) proceedings were instituted or continued through malice; (4) proceedings terminated on the merits in favor of the plaintiff or were abandoned; and (5) the plaintiff suffered injury or damage as a result of the prosecution. *Hanson v. City of Snohomish*, 121 Wn.2d 552, 558, 852 P.2d 295 (1993).  Malice and want of probable cause constitute the gist of a malicious prosecution claim.  *Id*.  Probable cause is a complete defense to a malicious

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    33**

prosecution claim. *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 499, 125 P.2d 681 (1942).

Because there is a genuine issue of material fact regarding the existence of probable cause, and malice as well, that precludes summary judgment for Edelbrock and Ruff, and for Starbucks and Spokane County which are potentially vicariously liable.

### a. Parr

The sole claim against Defendant Heidi Parr is for common law malicious prosecution.[17] Plaintiff contends Parr prolonged and "continued" Plaintiff's prosecution by failing to preserve video evidence that could have potentially exculpated him.[18]

On January 27, 2007, Parr was Regional Manager of Partner & Asset Protection for Starbucks. According to her declaration (Ct. Rec. 85), she learned on January 29, 2007 (a Monday) about the incident involving Plaintiff which had occurred on January 27 (a Saturday). Parr says she learned of the incident via an e-mail communication from the Customer Relations Department reporting that a customer had been observed exposing himself and masturbating at the drive through "ordering screen" or menu board. Because the camera at the menu board does not record, Parr asserts "Starbucks had no video recording of alleged exposure to provide to law enforcement" and the prosecutor was advised of the same, apparently in early February 2007. (See p. 011, Ex. B to Ct. Rec. 86). Parr

---

[17] Plaintiff concedes that judgment should be awarded for Parr on all other claims asserted against her.

[18] The indecent exposure charges against the Plaintiff were dismissed by an order dated June 15, 2007, approximately six months after the incident.

**ORDER RE MOTIONS FOR SUMMARY JUDGMENT- 34**

acknowledges there are security cameras in the store which do record images, but the menu board camera is not part of the security system. A security camera records images at the drive-through window. Parr claims she never reviewed any recordings from any camera at the store from January 27, 2007. Parr indicates that store employees (such as Leslie Ruff) have no training in accessing those recordings. There is no dispute the security camera recordings are deleted after two weeks and therefore, the recordings of the drive-through window on January 27, 2007 would have been destroyed two weeks after that date.

Plaintiff asserts a reasonable inference is that Parr would have viewed security camera video after receiving information about the incident and the charges which had been filed against the Plaintiff. Plaintiff asserts Parr's claim that she did not bother to view any video recordings is not credible because even if she believed the alleged exposure had not occurred at the drive-through window, "any reasonable person would have expected that a video recording of Plaintiff at the drive up window close in time and proximity to the alleged exposure [at the menu board] would likely contain information helpful to the prosecution." Plaintiff says a more credible explanation of Parr's failure to provide any video is that she did view video of the drive-through window and determined it did not support the allegations against the Plaintiff and so she deliberately chose not to preserve any video recordings from January 27, 2007. Plaintiff contends a jury should determine whether Parr truthfully communicated to law enforcement or the prosecutor all the facts and circumstances of which she knew.

The record shows the information that was electronically communicated to Parr on January 29 regarding the incident was specifically that "[w]hile **at the ordering screen**, [Plaintiff] leaned back, exposed himself, then started to masturbate." (See p. 008, Ex. B to Ct. Rec. 86)(emphasis added). There is no evidence in the record that Parr was ever advised that the alleged masturbation took place at the drive through window which is distinct from the "ordering

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    35**

screen" (menu board).  There is no evidence that the Spokane County Prosecutor's office at any time specifically asked Parr for a video recording from the drive-through window.  A "Partner and Asset Protection Report" generated by Starbucks includes an entry indicating that in February 2007, the Spokane County Prosecutor's office requested video of the incident,  but was advised that "Drive Thru outside camera does not record."  (See p. 011, Ex. B to Ct. Rec. 86).  The "Description" of the incident in the report is "1/29/07 male customer arrested for exposing himself to partners at the drive thru **ordering** camera."  (*Id*. at p. 009)(emphasis added).  At her deposition, Parr testified consistent therewith: "We were asked to get video from the menu board, from the drive-up menu board, that camera does not record."  (Parr Dep. at p.81, Ex. A to Ct. Rec. 86).  Consequently, the court must find Parr had no reason to view and preserve video recordings of activity at the drive-through window on January 27, 2007.  Furthermore, considering there is no dispute that the exposure occurred or did not occur at the menu board, no possible exculpatory information could have been revealed by a recording of the Plaintiff at the drive-through window.

Summary judgment will be granted to Parr on the common law malicious prosecution claim asserted against her.

### 3.  Defamation (Defendants Edelbrock, Dave Reagan and Spokane County)

The elements a plaintiff must establish in a defamation case are falsity, an unprivileged communication, fault, and damages.  *Mohr v. Grant*, 153 Wn.2d 812, 822, 108 P.3d 768 (2005).  To defeat a defamation claim, "[a] defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the 'sting' is true."  *Mark v. Seattle Times*, 96 Wn.2d 473, 494, 635 P.2d 1081 (1981).  The release of information to the press and public by police officers is subject to a qualified privilege.  The privilege is lost, however, where

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    36**

the officers have knowledge that the information is false or recklessly disregard the falsity of the information.  *Bender*, 99 Wn.2d at 601.  "The right to inform the public . . . does not include a license to make gratuitous statements concerning the facts of a case or disparaging the character of other parties to an action." *Id.*

The court concludes there is a genuine issue of material fact regarding the "falsity" of the January 29, 2007 Spokane County Press Release.  (Ex. H to Ct. Rec. 73).  In other words, there is a genuine issue of material fact whether the press release is substantially true or that the "gist" of the story is true.  This conclusion logically follows from the court's finding that there is a genuine issue of material fact whether Edelbrock lacked probable cause to arrest the Plaintiff based on what amounts to a potential reckless disregard of the truth on his part. The press release, which identifies the Plaintiff by his full name and provides his full residential address, states unqualifiedly that the Plaintiff "exposed himself to three employees at the 10510 Highway 2 Starbucks Coffee Store" and that "his actions were captured on videotape."  As discussed above, there is evidence in the record which questions whether any of the three employees told Edelbrock that the Plaintiff had exposed himself, or that anyone told Edelbrock the exposure was caught on videotape, as opposed to him merely assuming it was caught on videotape.[19]  The press release goes on to say that Plaintiff "denied any inappropriate actions, but when confronted with the videotape information, said they were only a joke."  The public could reasonably infer from this that Plaintiff admitted he exposed himself.  Plaintiff has never admitted exposing himself and says the "only a joke" comment was meant to refer to his statement to the baristas that his delay in pulling forward to the drive-through window was because he was "napping."  (DiBiasi Declaration, Ct. Rec. 102).

---

[19]  As of the date of the press release (January 29, 2007), there was still no confirmation that any video recording in fact existed.

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    37**

1    Because there is a genuine issue of material fact whether  Edelbrock

2  charged the Plaintiff with indecent exposure in reckless disregard of the truth,

3  there is a genuine issue of material fact whether he defamed the Plaintiff.

4  Obviously, Edelbrock's information and his police report was the basis for the

5  press release.  With regard to Spokane County Public Information Officer Sgt.

6  Dave Reagan who issued the press release, the county does not tender a specific

7  argument that Reagan could not possibly have recklessly disregarded the falsity of

8  any of the statements in the press release (in other words, that he cannot bear any

9  "fault").  The court finds there is a genuine issue of material fact not only whether

10  the statements in the press release were false, but also if they were false, whether

11  Edelbrock and Reagan recklessly disregarded that falsity.  As such, there is also

12  potential vicarious liability for the County of Spokane.

13    Defendants assert the Plaintiff's defamation claim should fail because he

14  has produced no evidence of being damaged.  As Plaintiff notes, however, in

15  Washington, damages are presumed if the statements are defamatory *per se*.

16  *Haueter v. Cowles Pub. Co.*, 61 Wn.App. 572, 578, 811 P.2d 231 (1991).  "A

17  publication is libelous *per se* if it tends to expose a living person to hatred,

18  contempt, ridicule or obloquy, to deprive him of the benefit of public confidence

19  or social intercourse."  *Id.*  It is only when the published words are not libelous *per*

20  *se* that special or actual damages must be alleged and proved.  *Id.*  The "imputation

21  of a criminal offense involving moral turpitude is libel per se."  *Amsbury v.*

22  *Cowles Pub. Co.*, 76 Wn.2d 733, 738, 458 P.2d 882 (1969).  Indecent exposure is

23  a crime of moral turpitude and the press release issued by the Spokane County

24  Sheriff's Office stated as a fact that Plaintiff had exposed himself.  If Plaintiff

25  establishes to the jury's satisfaction that he was defamed, he is entitled to general

26  compensatory damages in an amount to be determined by the jury.

27  //

28  //

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    38**

### 4. Assault and Battery (Defendants Edelbrock and Spokane County)

Because there is a genuine issue of material fact whether Edelbrock employed excessive force on the Plaintiff in violation of the Fourth Amendment, there is likewise a genuine issue of material fact whether he assaulted and battered the Plaintiff in violation of state (common) law.  Assault is an attempt, with unlawful force, to inflict bodily injuries upon another with the apparent present ability to give effect to the attempt if not prevented.  *Brower v. Ackerley*, 88 Wn.App. 87, 92, 943 P.2d 1141 (1997).  The gist of a cause of action for civil assault is "the victim's apprehension of imminent physical violence caused by the perpetrator's action or threat."  *Id.*, quoting *St. Michelle v. Robinson*, 52 Wn.App. 309, 313, 759 P.2d 467 (1988).  Battery occurs where a tortfeasor intends harmful or offensive physical contact with another, there is such contact,  and the Plaintiff did not consent to the same.  *Bundrick v. Stewart*, 128 Wn.App. 11, 18, 114 P.3d 1204 (2005).  For these common law torts, Spokane County is subject to potential vicarious liability on the basis of *respondeat superior*.

### D. Washington Law Against Discrimination (WLAD) (Defendants Starbucks and Ruff)

The WLAD bans discrimination on the basis of "any sensory, mental, or physical disability," and provides that freedom from discrimination includes "the right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement."  RCW 49.60.030(1)(b).  RCW 49.60.215 provides:

> It shall be an unfair practice for any person or the person's agent or employee to commit an act which directly or indirectly results in any distinction, restriction, or discrimination, . . . or the refusing or withholding from any person the admission, patronage, . . . presence, . . . staying, or lodging in any place of public resort, accommodation, assemblage or amusement, . . . regardless of . . . the presence of any sensory, mental, or physical disability.

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    39**

To make a prima facie case of discrimination in public accommodations on the basis of disability, a plaintiff must show: (1) the plaintiff has a disability recognized under the statute, (2) the defendant's business or establishment is a place of public accommodation, (3) the plaintiff received treatment not comparable to the level of services provided to individuals without disabilities, and (4) the disability was a substantial factor causing the discrimination. *Fell v. Spokane Transit Authority*, 128 Wn.2d 618, 637, 911 P.2d 1319 (1996).

Defendants do not dispute that plaintiff has a "disability" recognized under the WLAD.  "Disability" means the presence of a sensory, mental, or physical impairment that is medically cognizable or diagnosable, or exists as a record or history.  RCW 49.60.040(25)(a)(i) and (ii).  Ronald M. Klein, Ph.D., a clinical psychologist, has reviewed Plaintiff's medical records dating back to 1992, and has met with the Plaintiff on two occasions, including an interview in Klein's office that last approximately three hours.  It is Dr. Klein's conclusion that Plaintiff suffers from several psychological disorders, including obsessive compulsive disorder, anxiety disorder, and paranoid personality disorder, and that these disorders have been present for many years.  (Klein Declaration, Ct. Rec. 103).  The Defendants do not challenge this particular conclusion (they "do not contest Dr. Klein's diagnosis of [Plaintiff's] psychological disorders"), although they do challenge, via a "Motion To Exclude," certain other opinions and conclusions by Dr. Klein.[20]

There is also no dispute that Starbucks is "a place of public accommodation" as defined in  RCW 49.60.040(10).  What is in dispute is whether the Plaintiff received treatment not comparable to the level of services provided to individuals without disabilities, and whether his disability was a substantial factor causing the discrimination.  Based on the evidence discussed

[20] That motion is addressed in a separate order issued by the court.

**ORDER RE MOTIONS
FOR SUMMARY JUDGMENT-    40**

above, there is a genuine issue of material fact whether Ruff, who knew there was something "not quite right" about the Plaintiff, had grown weary of his odd behavior (in addition to his offensive comments to baristas), and as a result, falsely reported to law enforcement that the Plaintiff had exposed himself.[21]   There is a genuine issue of material fact whether Plaintiff's disability would have been a substantial factor in Ruff making any such false accusation.   Consequently, the court cannot grant summary judgment to Ruff and Starbucks on Plaintiff's WLAD public accommodation claim.[22]   For reasons discussed above, the court cannot rule as a matter of law at this juncture that Starbucks or Ruff are entitled to immunity from the WLAD claim under RCW 4.24.510.[23]

//

//

//

---

[21]  Plaintiff says Ruff had no reason to get law enforcement involved because she could have simply refused service to the Plaintiff and indeed, on the the day in question (Jan. 27, 2007), told the Plaintiff to leave and not come back. Nevertheless, it is apparent that getting law enforcement to trespass an individual is a more effective method of insuring that an individual will never return to a particular business.

[22]  Starbucks' potential liability under WLAD is as Ruff's employer based on the theory of *respondeat superior*.  *Brown v. Scott Paper Worldwide Co.*, 143 Wn.2d 349, 360 n. 3, 20 P.3d 921 (2001).

[23]  With regard to the state law tort claims and WLAD claim asserted against Starbucks, Starbucks would appear to qualify as a "person" eligible for immunity under RCW 4.24.510.  *Segaline*, 144 Wn.App. at 323 (holding that state agencies are "persons" under RCW 4.24.510, noting that RCW 1.16.080(1), which defines "person" for the purposes of the entire RCW, states that "[t]he term person may be construed to include the United States, this state, or any state or territory, or any public or private corporation or limited liability company, as well as any individual").

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    41**

**III. CONCLUSION**

Defendant Heidi Parr's Motion For Summary Judgment (Ct. Rec. 83) is **GRANTED** and Parr is awarded judgment on all claims asserted against her.

The County Defendants' Motion For Summary Judgment (Ct. Rec. 72) is **GRANTED in part** and **DENIED in part**.  It is **GRANTED** with respect to Defendant Ozzie Knezovich and he is awarded judgment on all claims asserted against him.[24]  It is also **GRANTED** with respect to Defendant Spokane County on all 42 U.S.C. Section 1983 claims asserted against it.  It is **GRANTED** with respect to the 42 U.S.C. Section 1983 civil conspiracy claim asserted against Defendant Edelbrock and he is awarded judgment on that claim.  It is **DENIED** with respect to the other 42 U.S.C. Section 1983 claims and state law tort claims asserted against Edelbrock (false arrest/imprisonment, malicious prosecution, excessive force, and defamation).  It is also **DENIED** with respect to the state law defamation claim asserted against Defendant Reagan.  Spokane County is subject to potential vicarious liability for the state law tort claims asserted against Edelbrock and Reagan.

The Motion For Summary Judgment filed by Defendants Starbucks and Leslie Ruff (Ct. Rec. 77) is **GRANTED in part** and **DENIED in part**.  It is **GRANTED** with respect to all 42 U.S.C. Section 1983 claims asserted against Defendant Starbucks and Starbucks is awarded judgment on all of those claims.  It is **GRANTED** with respect to the Section 1983 civil conspiracy claim asserted against Defendant Ruff and she is awarded judgment on that claim.  The motion is **DENIED** with respect to the state law tort claims (false arrest/imprisonment and

---

[24] Spokane County Sheriff Ozzie Knezovich is named as a Defendant in the Amended Complaint.  Plaintiff alleges supervisory liability on the part of Knezovich in failing to adequately train and supervise Deputy Edelbrock.  Plaintiff concedes he cannot raise a genuine issue of material fact regarding this and that judgment should be entered in favor of Knezovich on this claim.

**ORDER RE MOTIONS**
**FOR SUMMARY JUDGMENT-    42**

malicious prosecution) asserted against Ruff, and the WLAD claim asserted against her.  Starbucks is subject to potential vicarious liability on these claims.

**IT IS SO ORDERED**.  The District Court Executive is directed to enter this order and forward copies to counsel of record.

**DATED** this   22nd   day of May, 2009.

*s/Lonny R. Suko*

LONNY R. SUKO
United States District Judge

**ORDER RE MOTIONS
FOR SUMMARY JUDGMENT-     43**